# STATE OF MICHIGAN

# COURT OF APPEALS

EDWARD CASTLE JR and THE FILTER
DEPOT LLC,

UNPUBLISHED
August 7, 2018

Plaintiffs-Appellants/Cross-
Appellees,

v

No. 337969
Macomb Circuit Court
MARCIA SHOHAM, JONATHAN SHOHAM,
and MIDWEST AIR FILTER, INC.,

LC No. 2014-003568-CB

Defendants-Appellees/Cross-
Appellants.

Before: SERVITTO, P.J., and GLEICHER and STEPHENS, JJ.

PER CURIAM.

In this member oppression action, plaintiffs appeal as of right the trial court's order of no cause of action on their claims of member oppression, fraud, breaches of contract, unjust enrichment and breach of fiduciary duties against Midwest Air Filter, Inc. and their claim of aiding and abetting against defendants Marcia and Jonathan Shoham. Defendants cross-appeal the trial court's entry of a judgment against The Filter Depot, LLC. We affirm in part, reverse in part, and remand for entry of a judgment in favor of plaintiffs as to plaintiffs' claims of member oppression, breach of fiduciary duties, and aiding abetting and a determination of appropriate damages on those claims.

## FACTS

In 2000, Edward Castle, Jr. ("Castle") and then-owner of Midwest Air Filter, Inc. ("MAF"), Bill Down ("Down") formed The Filter Depot, LLC ("Filter Depot") for the purpose of selling air filtration products to customers in the Detroit area. MAF had been in that business for some time throughout various areas, having six branches, and Castle had contacts for selling such products in the Detroit area. Castle was 49% owner of Filter Depot and MAF was 51% owner. The initial operating agreement ("OA") for Filter Depot called for MAF to invest $5100 and Castle to invest $4900 to start the company. The OA further provided that profits from Filter Depot were to be split 50/50 between Castle and MAF. Castle's son, Dave, began working with castle at Filter Depot in 2001.

In 2002, Castle and Down (acting in the capacity as owner of MAF) agreed, by way of handshake, that MAF should receive 2% of Filter Depot's gross sales per month as a management fee, since MAF was providing administrative functions for Filter Depot (accounting, payroll, human resources, etc.). Filter Depot operated in this manner without incident until Down passed away in March 2013. Thereafter, in May 2013, Down's daughter and son-in-law, the Shohams, purchased MAF. According to Castle, MAF, at the direction of the Shohams, asserted complete control over Filter Depot and deprived Castle of the right to attend meetings for the company, to vote, and to participate in discussions, and further engaged in self-dealing with respect to Filter Depot. Castle took issue primarily with MAF issuing consent resolutions to increase the management fee payable to MAF and to issue capital calls. He and Filter Depot thus filed suit against the Shohams and MAF in September 2014 alleging that MAF engaged in a variety of wrongs including member oppression in violation of MCL 450.4515, fraud, breach of contract, and breach of fiduciary duties. Plaintiffs alleged that the Shohams aided and abetted in these activities. Plaintiffs sought an accounting and damages.

In October 2014, Filter Depot brought suit in a separate case against Castle for breaching Filter Depot's OA by failing to contribute to a capital call issued by consent resolution on May 9, 2014, and breaching his fiduciary duties. The trial court ordered that the matters would be consolidated for purposes of discovery and trial.

Relevant to the instant matter, in a January 21, 2016 opinion and order, the trial court denied a motion for partial summary disposition brought by Castle. Castle sought dismissal of Count I of Filter Depot's complaint against him, which alleged that Castle had breached the OA by failing to contribute to a capital call. Although the trial court ruled that the decision to make a capital call involved an actual or potential conflict of interest for MAF and therefore potentially required a vote of the members, it also determined that conflicting provisions in the OA rendered the agreement "ambiguous" and that "additional factual development" was needed to determine the "intent" of the conflicting provisions. Accordingly, the trial court denied partial summary disposition of this claim. In another motion for partial summary disposition, Castle asserted that the OA did not permit Filter Depot to unilaterally increase the management fee. In a written opinion issued February 12, 2016, the trial court held that the management fee hike did not violate ¶ 7.1 of the Operating Agreement and that the management fee was not perpetually capped at 2%.

A bench trial began in the consolidated matters on May 17, 2016, and concluded on May 20, 2016. The trial court issued its opinion and order with respect to the trial on March 31, 2017, finding no cause of action with respect to all parties' claims.

MEMBER OPPRESSION

On appeal, plaintiffs first assert that the trial court erred in entering no cause of action as to their membership oppression claim under MCL 450.4515. According to plaintiffs, while the trial court found that MAF breached the OA and that the breaches affected Castle's membership interest, it gave inadequate weight to these findings, gave no weight to the fact that defendants terminated Castle's employment, did not consider the totality of the circumstances of defendants' actions, and improperly placed the burden of showing the entire unfairness of defendants' self-

dealing on plaintiffs. Because the trial court erred legally and factually, we reverse two aspects of its rulings with respect to Castle's member oppression claims.

In bench trial matters, MCR 2.517(A)(1) requires the trial court to "specifically" find the facts, "state separately its conclusions of law," and to enter an appropriate judgment. We review a trial court's factual findings in a bench trial for clear error. *Prentis Family Found v Barbara Ann Karmanos Cancer Inst*, 266 Mich App 39, 59; 698 NW2d 900 (2005). "A factual finding is clearly erroneous if there is no substantial evidence to sustain it or if, although there is some evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Miller-Davis Co v Ahrens Const, Inc*, 495 Mich 161, 172; 848 NW2d 95 (2014 (footnotes omitted). We review conclusions of law de novo. *Chelsea Inv Group LLC v Chelsea*, 288 Mich App 239, 250; 792 NW2d 781 (2010). This Court also reviews de novo questions of statutory interpretation. *People v Gardner*, 482 Mich 41, 46; 753 NW2d 78 (2008).

Filter Depot is undisputedly a limited liability company (LLC) and Castle is undisputedly a member. MAF is also undisputedly the only other member and the majority member, with 51% of the shares of Filter Depot. MCL 450.4515 provides:

> (1) A member of a limited liability company may bring an action in the circuit court of the county in which the limited liability company's principal place of business or registered office is located to establish that acts of the managers or members in control of the limited liability company are illegal or fraudulent or constitute willfully unfair and oppressive conduct toward the limited liability company or the member. If the member establishes grounds for relief, the circuit court may issue an order or grant relief as it considers appropriate, including, but not limited to, an order providing for any of the following:
>
> (a) The dissolution and liquidation of the assets and business of the limited liability company.
>
> (b) The cancellation or alteration of a provision in the articles of organization or in an operating agreement.
>
> (c) The direction, alteration, or prohibition of an act of the limited liability company or its members or managers.
>
> (d) The purchase at fair value of the member's interest in the limited liability company, either by the company or by any members responsible for the wrongful acts.
>
> (e) An award of damages to the limited liability company or to the member. An action seeking an award of damages must be commenced within 3 years after the cause of action under this section has accrued or within 2 years after the member discovers or reasonably should have discovered the cause of action under this section, whichever occurs first.

(2) As used in this section, "willfully unfair and oppressive conduct" means a continuing course of conduct or a significant action or series of actions that substantially interferes with the interests of the member as a member. Willfully unfair and oppressive conduct may include the termination of employment or limitations on employment benefits to the extent that the actions interfere with distributions or other member interests disproportionately as to the affected member. The term does not include conduct or actions that are permitted by the articles of organization, an operating agreement, another agreement to which the member is a party, or a consistently applied written company policy or procedure.

The definition of "willfully unfair and oppressive conduct" as "a continuing course of conduct or a significant action or series of actions that substantially interferes with the interests of the member as a member" in the LLCA mirrors the definition of the same phrase as set forth in the Michigan Business Corporation Act at MCL 450.1489(3) with the word "shareholder" taking the place of "member" in that statute. In *Franchino v Franchino,* 263 Mich App 172 189; 687 NW2d 620 (2004), the Court stated that "willfully unfair and oppressive conduct" refers to conduct that substantially interferes only with rights that automatically accrue to a shareholder *by virtue of being a shareholder*. Applying the same reasoning, only conduct that substantially interferes with rights that automatically accrue to a member by virtue of being a member will be considered for purposes of determining whether such conduct was willfully unfair and oppressive in a limited liability company.

Shareholder interests typically include actions like "voting at shareholder's meetings, electing directors, adopting bylaws, amending charters, examining the corporate books, and receiving corporate dividends." *Franchino*, 263 Mich App at 184. These same interests could be deemed typical of a member in a limited liability company. While employment is not generally listed among rights that automatically accrue to a shareholder (or by extension, a member), (*Id*.), MCL 450.4515(2) specifically states that the termination of employment may constitute willfully unfair and oppressive conduct "to the extent that the actions interfere with distributions or other member interests disproportionately as to the affected member."

As explained in *Frank v Linkner*, 500 Mich 133; 894 NW2d 574 (2017):

> In summary, MCL 450.4515(1) provides a cause of action for members of an LLC when the managers' actions are "illegal or fraudulent or constitute willfully unfair and oppressive conduct toward the limited liability company or the member." " '[W]illfully unfair and oppressive conduct' means a continuing course of conduct or a significant action or series of actions that substantially interferes with the interests of the member as a member." MCL 450.4515(2). Once a plaintiff has "establishe[d] grounds for relief" by proving that a defendant has engaged in one of these prohibited behaviors, "the circuit court may issue an order or grant relief as it considers appropriate, including, but not limited to," monetary damages. MCL 450.4515(1). Thus, the "harm" that is actionable under MCL 450.4515 is the "substantial [ ] interfer[ence] with the interests of the member as a member." The statute then enumerates a variety of remedies that a court might provide to a plaintiff once he or she has shown that the defendant substantially interfered with the plaintiff's interests as a member.

-4-

As the trial court indicated in its opinion and order after trial, Castle detailed a series of actions taken by defendants after the Shohams took over MAF that he avers were willfully unfair and oppressive. These actions are comprised primarily of (1) Castle's December 2014 termination, (2) the May 2014 capital call, and (3) the replacement of the 2% management fee.

With respect to Castle's termination, we do not find that the trial court clearly erred in determining that Castle was not subjected to willfully unfair and oppressive conduct under MCL 450.4515. In the letter terminating him from his employment as a salesperson, it was detailed that Castle was asked for critical information for administrative purposes such as expenses and insurance and was asked to train another salesperson and Castle was uncooperative. At trial, Castle admitted to being uncooperative about submitting expenses and to refusing to train another salesperson. The letter also detailed that he refused to sign a non-compete agreement, which Castle also testified that he refused to do. These not only appear to be legitimate and supported reasons for his termination, but Castle has not established that his termination interfered with distributions or other membership interests disproportionately. Castle still retained his 49% membership interest in Filter Depot, his status was acknowledged in the termination letter, and Castle has not established that his termination affected any right of his as a member. He simply lost his salary and employment as a salesperson. Because sufficient evidence supported that Castle was not subjected to willfully unfair and oppressive conduct under MCL 450.4515, Castle has not met his burden of demonstrating clear error regarding this aspect of his claim.

The capital call complained of was issued by consent resolution on May 9, 2014, and stated that Filter Depot "determined that additional Member capital contributions are necessary in order to operate the business," that MAF "has made additional capital contributions to the Company in the amount of $233,436.59 since January 1, 2009," and Castle and his son Dave[1] made none, and that "the Company requires Members Ed Castle and David Castle to make additional contributions to the Company in the amount of $167,067.36 and $57,214.85, respectively, within ten (10) business days from the date of this resolution . . . ." It was undisputedly issued without a vote or meeting.

The trial court found that the capital call violated a provision in the OA which required that notice of a capital call describe, in reasonable detail, the purposes and uses of such additional capital. We find this ruling to be legally sound. The trial court also found, however, that issuance of the capital call did not constitute willfully unfair and oppressive conduct because Castle did not answer the capital call (i.e., he suffered no harm). This ruling was based on an erroneous understanding of the law.

Our Supreme Court explained, in *Linkner*, 500 Mich at 133, that "unlike an action for tortious injury to a person, an action for LLC member oppression does not necessarily accrue when a plaintiff incurs a calculable financial injury. Instead, it accrues when a plaintiff incurs

---

[1] Dave Castle became a member manager of Filter Depot in 2010 when Castle gifted him, with MAF's approval, 2 ½ % of his Filter Depot stock. Castle gifted Dave and additional 2 ½ % of stock each year until, in 2014, Dave had a total of 12 ½ % interest in Filter Depot.

the actionable harm under MCL 450.4515, i.e., when defendants' actions allegedly interfered with the interests of a plaintiff as a member, making the plaintiff eligible to receive some form of relief under MCL 450.4515(1)." The harm has been incurred, then, once a plaintiff proves that a manager engaged in an action or series of actions that substantially interfered with his or her interests as a member, whether or not money damages or a calculable financial injury have yet occurred. *Id.* While the *Linkler* Court was discussing when a harm occurred under MCL 450.4515 for purposes of applying the correct statute of limitations, its analysis of what constitutes "harm" under MCL 450.4515 is relevant and persuasive.

According to *Linkler* rationale, Castle's action for minority member oppression would accrue when he "incurs the actionable harm under MCL 450.4515, i.e., when defendants' actions allegedly interfered with the interests of [Castle] as a member, making [Castle] eligible to receive some form of relief under MCL 450.4515(1)." MCL 450.4515(1), in turn provides that relief is available when a member shows that a controlling member acted in a way that constituted willfully unfair and oppressive conduct toward the LLC or another member. The purpose of having an action for minority shareholder oppression, then, is to protect those rights a shareholder has simply by being a shareholder, such as voting. When the shareholder has been denied that right, he has incurred actionable harm under MCL 450.4515 regardless of whether financial impact occurred. The interference with member interests *is* the harm. The trial court thus erred in its determination that issuance of the capital call, which violated the OA, was not willfully unfair and oppressive conduct simply because Castle did not respond to the capital call. As will be discussed later, this determination is relevant to a determination of whether the violation of the OA, under the totality of the circumstances, signifies "a continuing course of conduct or a significant action or series of actions that substantially interferes with the interests of the member as a member." MCL 450.4515.

Addressing the management fee, the trial court determined that MAF had a conflict of interest with respect to deciding how much Filter Depot should pay to MAF in management fees. The trial court further held that MAF violated the OA by failing to submit the issue of the management fee to a vote, as required by the OA. These decisions were supported by the record in that MAF, a company wholly owned by the Shohams, would benefit from charging and collecting a management fee from Filter Depot, a company they had only a 51% interest in. All members have the right to vote on issues involving a transaction involving an actual or potential conflict of interest between a manager and company under ¶ 6.1 of the OA. Castle was denied the right to vote.

Nevertheless, the trial court further found that the above conduct was not "evidence of oppression under MCL 450.4515" because the management fees imposed by the consent resolutions were fair. The trial court cited MCL 450.4409 in support of that decision. MCL 450.4409 states, in relevant part:

> (1) Except as otherwise provided in an operating agreement, a transaction in which a manager or agent of a limited liability company is determined to have an interest shall not, because of the interest, be enjoined, be set aside, or give rise to

an award of damages or other sanctions, in a proceeding by a member or by or in the right of the company, if the manager or agent interested in the transaction establishes any of the following:

(a) The transaction was fair to the company at the time entered into.

What the trial court failed to recognize was (4) of MCL 450.4409, which states, "Satisfying the requirements of subsection (1) does not preclude other claims relating to a transaction in which a manager or agent is determined to have an interest. Those claims shall be evaluated under principles of law applicable to a transaction in which a similarly situated person does not have an interest." Looking at the specific language of the statute, then, it appears that a transaction in which a manager has an interest will not be enjoined, set aside, or give rise to damages *simply because of the manager's interest* so long as the manager proves that the transaction was fair to the company. This does not mean, though, that the transaction will be found sound in all cases as long as the manager establishes it was fair; rather, it means that so long as the fairness is established, the manager's interest in the transaction, standing alone, will not serve as a basis for setting aside or enjoining the transaction or awarding damages. When a self-dealing transaction is deemed fair to the company at the time it was entered into, we are then to look at the transaction in the way we would "in which a similarly situated person does not have an interest," i.e., as between two disinterested parties rather than as between a self-interested managing member and the company. Thus, a finding of "fair" under MCL 450.4409(1)(a) is not conclusive as to whether to the entire transaction was evidence of or amounted to willfully unfair and oppressive conduct, contrary to what the trial court held.

With that framework in mind, we thus take on the heavy first task of determining whether the management fee was, in fact, fair to Filter Depot, as argued by defendants and found by the trial court. It is not until that determination is made that we can tackle the next step and review whether, if the fee was indeed fair to Filter Depot, it nevertheless constituted "willfully unfair and oppressive conduct toward the limited liability company or the member." MCL 450.4515(1). Defendants provided the testimony of Cynthia Tremain, MAF's accountant from 1992 through approximately December 2012, to support their claim that the increase in the management fee was fair.

Tremain testified that when the Shohams took over MAF they asked for an analysis for the period of July 2012 through 2013 so they could see an accurate accounting of the real costs of Filter Depot. According to Tremain, in preparing the analysis, she reviewed a truck lease, fuel costs for deliveries, wages and benefits for MAF employees for hours they worked for Filter Depot, then added resources allocated to Filter Depot such as software and warehouse storage, and a percentage of MAF's preexisting fixed overhead to come up with a consent resolution increasing the management fee from 2% per month to $17,567 per month for June-August 2013. The number was analyzed every three months and adjusted accordingly.

Howard McFarland, MAF's part-time CFO since December 2015 testified that he prepared the Filter Deport consent resolution dated December 1, 2015, using prior consent resolutions to inform his preparation. He opined that the records kept by MAF were very complete and accurate, with the exception of a $50,000 settlement that did not appear in Filter Depot's books as the result of an error.

Carolyn Riegler, a CPA and certified fraud examiner, testified on behalf of plaintiffs. She testified that when given access to Filter Depot's financial records, she had many questions concerning the records on topics such as notes receivable and a loan on its books, but these questions were not answered by Tremain or other MAF employees. When Riegler found it odd that Filter Depot had recorded cash on hand of $150 every year, Tremain and other MAF employees explained that there was no way to see how much cash on hand Filter Depot had, since all the corporate accounts were combined in a joint account with MAF. When Riegler asked how much Filter Depot had in the bank right now belonging to it, the MAF employees told her they don't calculate that. Tremain similarly testified that there was only one payroll for MAF and Filter Depot and that the cash account was shared between the two companies.

Riegler testified that upon her examination of Filter Depot's books, she found that allocations and not actual expenses were recorded for Filter Depot. There were no payments of bills, collections of cash or actual transactions recorded. Rather there were journal entries where MAF allocated everything to Filter Depot. For example, if there was a charge for an item like health insurance, MAF would pay the insurance and then charge it back to Filter Depot instead of Filter Depot having a separate record. There was no discernable separation of these two businesses and it was hard to validate the charges being attributed solely to Filter Depot.

Riegler testified that she prepared a financial summary for Filter Depot from 2009-2014. She looked at asset sheets, revenues, cost of revenue, and operating expenses. From 2009 through 2013, Filter Depot had an average gross profit margin of between 32% and 34%, with sales between $1.3 and $1.4 million, and a cost of sales between $900,000 and $960,000. The operating expenses all remained pretty consistent for Filter Depot throughout those years. The biggest change in operating expenses came in 2013, when the management fee increased from $28,000 to $125,000 and, for the first six months of 2014, the management fee was $93,000.00.

Riegler went through a detailed analysis of the costs and charges that went into the changed monthly management fee, breaking them down into five categories and addressing each in depth. She testified that the first category was charges for warehouse employees' wages and benefits and that 30% of the MAF warehouse employees' wages were charged to Filter Depot. Riegler found this number to be problematic due to the fact that there was no inventory listed on MAF's tax returns or general ledgers for it and there was no backup information to support the allocation of inventory space to Filter Depot. She also found it a particularly high number considering that MAF employees were working for and dealing with inventory for all six MAF branches in addition to the one Filter Depot branch, and that neither Tremain nor any other MAF financial employee could tell her the size of Filter Depot's inventory or how MAF separates it out.

We also note certain oddities in the warehouse wages on documentation submitted by defendants. For example, in a document detailing wages for a three-month period from June 1, 2013, through August 30, 2013, one warehouse employee's wages of $37,706 were allocated to Filter Depot. Tremain testified that the employee was a delivery person for the warehouse and that those were, in fact, his wages for those three months. The exact same wage amount, however, was attributed to the same employee for the much longer period of July 1, 2012, through April 30, 2013, and allocated to Filter Depot for that time period.

The second category analyzed by Riegler was an allocation to Filter Depot for 23-30% of MAF's accounting and clerical employees' costs. Again, these MAF employees worked for all six of MAF's branches as well as Filter Depot and Riegler was unable to understand, due to a lack of supporting documentation, how Filter Depot was allocating these expenses, based on the size and volume of sales of the other MAF divisions.

The third category of costs and charges allocated to Filter Deport as part of the management fee was 15% of MAF's executive costs. Riegler found no documentation to support this allocation. The fourth category, the truck lease and fuel cost category, was well accounted for and supported for and Riegler thus found the allocated amount to be sound.

The final category of costs and charges consisted of building rent and other expenses associated with the building. MAF charged Filter Deport 30% of its rent as part of the management fee. Comparing the building warehouse rent to similar warehouse rents in the area, Riegler found the rent to be overcharged by $2.77 per square foot. This is troubling, particularly given that MAF is 50% owner of the warehouse building and its vice-president the other 50% owner and they determine the rental rate.

In addition, Filter Depot was charged for 20% of MAF's warehouse space. Riegler was unable to get any answers from MAF concerning how much inventory of Filter Depot was being housed in the warehouse to justify the allocation. Tremain testified that reports would allow them to see what inventory was purchased for Filter Depot, though they were not made part of the record. Tremain further testified that it would be hard to be exact and they felt that 20% allocation to Filter Depot for warehouse space would be fair.

An exact allocation of inventory space would, indeed be difficult, due to MAF's practice of purchasing all inventory on its books, then charging it back to Filter Depot as necessary. Interestingly, regarding inventory, Riegler testified that she saw and questioned substantial inventory rebates on MAF's financial statements when Filter Depot had none, but received no information concerning the rebates.

The evidence established that from 2009 through 2014 Filter Depot's tax returns show gross sales between $1.16 million and $1.43 million per year and gross profits between $408,000 and $484,000 per year. The 2015 tax year, however, shows gross sales of $763,791 and gross profit of $210,000—almost half. Clearly, Filter Depot's inventory had to go down. Yet, the building expenses and rent allocated to Filter Depot from June 1, 2014 through August 31, 2014 was, for example, $7698 and from June 1, 2015 through August 30, 2015 was $7784. Though the sales went down by half and the inventory would likely also have been greatly reduced during this time period, it appears no adjustment was made for the reduction in inventory space.

Moreover, Jonathan Shoham testified that the sales for MAF were five to six times more than Filter Depot's and were close to $6 million per year in May 2017. As stated above, Filter Depot sales in 2015 were $763,791. As both MAF and Filter Depot are in the same line of business, it would seem that the building space inventory and overhead attributable to a $6 million-per-year company with six branches would be much more than a company with less than $1 million a year in sales contained in a single branch.

It is certainly fair to allocate the costs of doing business to Filter Depot and there appears to be adequate support for certain of the categories of expenses and costs making up the management fee. And, contrary to plaintiffs' claim, the trial court did not require plaintiffs to establish that the fees were unfair in those categories, rather than requiring defendants to prove that the fee was fair. The building rent and other expenses associated with the building, however, which makes up almost 1/3 of the monthly management fee, lacks support for the following reasons: this amount remained substantially the same despite the substantial decline of Filter Depot's sales (and very likely its inventory); the fact that MAF is in control of the amount of rent payable to itself and benefits from Filter Depot paying the rent, and; that no report showing the amount of Filter Depot inventory in the warehouse was submitted and, arguably, none of the inventory in the warehouse was attributable to Filter Depot given that MAF put all inventory in its books first.

Charging the same amount for building rent and other expenses associated with the building, when that amount was approximately 1/3 of the management fee, severely affected the viability of Filter Depot. Prior to 2013, the management fee was 2% of gross sales per month and Filter Depot was also charged a flat rate per delivery. With gross sales averaging around $1.3 million per year from 2009-2013, the monthly management fee would be approximately $2100 plus delivery fees, per month. The first consent resolution increased the management fee to over $17,000 per month or approximately $204,000 per year.

As stated in *Fill Bldgs, Inc v Alexander Hamilton Life Ins Co of Am*, 396 Mich 453, 461; 241 NW2d 466 (1976):

> Given an instance of alleged director enrichment at corporate expense such as in this case, the burden to establish fairness resting on the director requires not only a showing of 'fair price' but also a showing of the fairness of the bargain to the interests of the corporation. Only when a convincing showing is made in both respects can 'fairness' under the statute be said to have been established.

The only testimony concerning the rent and building overhead came from Riegler, who is also a real estate agent. She testified that the rent for comparable warehouses was between $3.30 and $3.36 per square foot annual rent and that MAF's rent was $6.43 per square foot of which 30% was allocated to Filter Depot. There was no other testimony concerning the rent and no support for an allocation of inventory space, such that the trial court did, in fact, inappropriately place the burden on plaintiffs to establish that part of the management fee was unfair.

Based on the above, the trial court clearly erred in finding that the entire management fee was fair. Unrebutted evidence provided by Riegler established that with respect to several components of the management fee, Filter Depot failed to sustain its burden of proving by a preponderance of the evidence a reasonable basis for the management fee it imposed and thereby failed to establish that the overall management fee was fair. The question thus becomes whether defendants' actions, as a whole, amount to willfully unfair and oppressive conduct. The trial court has already determined that the imposition of the management fee without a vote and its issuance of the capital call were violations of the OA. These actions are evidence of willfully unfair and oppressive conduct. Defendants' imposition of a management fee, 1/3 of which was

not supported by evidence on the record was imposed through a consent resolution also evidences the same proposition. MAF, as landlord of the building, majority shareholder of Filter Depot and 100% owner of a company directly competing with Filter Deport, stands to benefit 100% from every unilateral action it takes as majority shareholder in Filter Depot and, indeed, does so by issuing consent resolutions without a vote. Even if Castle would be outvoted on a resolution, he has the right to and should be given the opportunity to vote on issues affecting Filter Depot.

In sum, the trial court committed legal error by ruling that the capital call did not violate MCL 450.4515(2). The trial court also clearly erred in finding that the management fee was fair, given the unrebutted evidence presented by Castle repudiating the fairness of the management fee. The actions of issuing a capital call that violated the OA and imposing an unsupported management fee establish that MAF engaged in "a continuing course of conduct or a significant action or series of actions that substantially interferes with the interests of the member as a member" and thus engaged in member oppression under MCL 450.4515. The trial court erred in finding no cause of action on plaintiff's claim of member oppression and we therefore remand to the trial court on this issue for entry of a judgment in plaintiff's favor and against MAF on plaintiff's claim of member oppression and for a determination of damages on this claim.

## FRAUD

Plaintiffs next contend that the trial court erred in entering no cause of action on its claims for fraud. We disagree.

Plaintiffs raised claims of both fraudulent misrepresentation and silent fraud. Fraudulent misrepresentation is established by the following elements: (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage. *Bergen v Baker*, 264 Mich App 376, 382; 691 NW2d 770 (2004), quoting *M & D, Inc, v WB McConkey*, 231 Mich App 22, 27; 585 NW2d 33 (1998) (quotation marks omitted). A fraudulent misrepresentation claim requires an "affirmative representation" that is false and "made with an intent to deceive." *Id*. at 27.

Plaintiffs' claims in this respect are based on an alleged misrepresentation as to the need for a capital call, misrepresentations that MAF paid its share of the capital call, and representations that the increased management fees correlated to actual costs. Plaintiffs did not establish that MAF misrepresented the need for a capital call or that the actual costs charged as a management fee (the overhead and rent were just stated as a percentage) were incorrect rather than unfair or simply lacked support. However, it was established at trial that MAF did not, in fact, contribute its share of the capital call. Nevertheless, for the fraud claim to succeed, plaintiffs must establish that they suffered damages as a result of relying on the misrepresentation. Plaintiffs have not claimed or established that they relied on MAF's assertion that it made its share of the capital contribution (in fact, plaintiffs vehemently argued at trial that MAF never contributed anything) or that they suffered any damages as a result of any purported reliance. The fraudulent representation claim thus fails.

Silent fraud, also known as fraudulent concealment, requires that the plaintiff show that "the defendant suppressed the truth with the intent to defraud the plaintiff and that the defendant had a legal or equitable duty of disclosure." *Lucas v Awaad*, 299 Mich App 345, 363–364; 830 NW2d 141 (2013). "A plaintiff cannot merely prove that the defendant failed to disclose something; instead, a plaintiff must show some type of representation by words or actions that was false or misleading and was intended to deceive." *Id*. at 364 (internal quotation marks removed); *Hord v Environmental Research Institute of Mich*, 463 Mich 399, 412; 617 NW2d 543 (2000). A silent fraud claim also requires proof of reliance on the representation. *Hamade v Sunoco, Inc (R & M)*, 271 Mich App 145, 171; 721 NW2d 233 (2006).

Plaintiffs' claims on this issue are based on MAF's alleged withholding of Filter Depot's financial information and its failure to disclose that the books and finances of Filter Depot were commingled with those of MAF. Plaintiffs' claims on this issue fail because Castle testified that he never asked about Filter Depot's finances or books and had no understanding as to whether Filter Depot had separate books or accounts. Plaintiffs thus are unable to establish that MAF gave any impression or made any representation whatsoever, let alone a false or misleading one, concerning the books and accounts of Filter Depot. Their claim of silent fraud fails based on the same reasoning, as MAF never made any type of representation intended to deceive.

## BREACH OF CONTRACT AND UNJUST ENRICHMENT

Plaintiffs contend that the trial court erroneously found that they were not damaged by defendant's breaches of the OA, which was based on its erroneous finding that the self-dealing by MAF was fair. Plaintiffs further contend that defendants were unjustly enriched through their unlawful dealings and transactions. We disagree.

Pursuant to MCL 450.4102(2)(r) of the LLCA, an "operating agreement" is a written agreement between the members of a limited liability company pertaining to the affairs of the limited liability company and the conduct of its business. It is thus a contract between the members of a limited liability company, and is construed according to principles of contract interpretation. "The fundamental goal of contract interpretation is to determine and enforce the parties' intent by reading the agreement as a whole and applying the plain language used by the parties to reach their agreement." *Dobbelaere v Auto–Owners Ins Co*, 275 Mich App 527, 529; 740 NW2d 503 (2007). A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach. *Miller-Davis Co v Ahrens Const, Inc*, 495 Mich 161, 178; 848 NW2d 95 (2014).

While the trial court found that MAF breached the parties' OA with respect to its issuance of the capital call, it found that the result was harmless because the court deemed the capital call invalid and because plaintiffs made no contributions in response to the capital call. In essence, the trial court found that plaintiffs suffered no damages as a result of this breach. The trial court also found that MAF violated the OA with respect to unilaterally instituting the management fee without holding a vote but that plaintiffs suffered no damages because, as Castle was the minority shareholder, he would have been outvoted and the fee implemented in any event.

While breach of the OA in these respects may serve as a basis for an oppression action and plaintiffs' need not establish that financial harm occurred to them to sustain such an (See Issue I), plaintiffs must establish their damages in a breach of contract action. The proper measure of damages for a breach of contract is "the pecuniary value of the benefits the aggrieved party would have received if the contract had not been breached." *Ferguson v Pioneer State Mut Ins Co*, 273 Mich App 47, 54; 731 NW2d 94 (2006). The benefit plaintiffs would have received if defendants had abided by the provision in the OA that concerned itself with a capital call would have been a properly issued capital call or no capital call issued at all. The trial court found the capital call invalid, thus giving plaintiffs all of the benefits and relief it would have been entitled to.

The trial court also held that defendants violated the OA by failing to hold a vote before implementing the new management fee. Had a vote been held, in conformity with the agreement, MAF, as majority shareholder, would obviously had voted to implement the fee in any event and outvoted Castle on that issue. Plaintiffs thus suffered no awardable damages on their breach of contract claims.

As to plaintiffs unjust enrichment claim, "a contract will not be implied under the doctrine of unjust enrichment where a written agreement governs the parties' transaction." *King v Ford Motor Credit Co*, 257 Mich App 303, 327; 668 NW2d 357 (2003). An OA governs the parties' relationship on voting issues, the distribution of profits and myriad other issues. MAF, as majority shareholder, had the authority to render the consent resolution to impose the new management fee under the terms of the OA. We addressed the unfairness of the fee with respect to the shareholder oppression action, where it is properly addressed.

BREACH OF FIDUCIARY DUTIES

Plaintiffs next assert that the trial court erred in finding that defendants did not breach their fiduciary duties to Filter Depot. We agree.

This Court has defined a fiduciary relationship as:

[a] relationship in which one person is under a duty to act for the benefit of the other on matters within the scope of the relationship. Fiduciary relationships-such as trustee-beneficiary, guardian-ward, agent-principal, and attorney-client-require the highest duty of care. Fiduciary relationships [usually] arise in one of four situations: (1) when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first, (2) when one person assumes control and responsibility over another, (3) when one person has a duty to act for or give advice to another on matters falling within the scope of the relationship, or (4) when there is a specific relationship that has traditionally been recognized as involving fiduciary duties, as with a lawyer and a client or a stockbroker and a customer. [*In re Estate of Karmey*, 468 Mich 68, 75; 658 NW2d 796 (2003), quoting Black's Law Dictionary (7th ed)]

-13-

It is undisputed that limited liability companies involve fiduciary relationships. See NTS Am Jur 2d, Limited Liability Companies, § 11, pp 13–14. One is set forth in MCL 450.4404(1), "A manager shall discharge the duties of manager in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner the manager reasonably believes to be in the best interests of the limited liability company." Additionally, the language in MCL 450.4515 allowing for a minority member to bring an action against a controlling member for willfully unfair and oppressive conduct clearly implicates a fiduciary duty among members and a common law duty of good faith among such members. A fiduciary owes a duty of good faith, loyalty, and avoidance of self-dealing. *Prentis Family Foundation, Inc*, 266 Mich App at 49.

The trial court found that the plaintiff's claims of breach of fiduciary duties based on alleged non-disclosures by MAF (as addressed in plaintiffs' fraud claims) failed for lack of support, those based on the capital call did not cause Castle damages and those based on the alleged self-dealing regarding the management fee fail because the fees were fair. As we previously stated, the trial court's legal ruling with respect to the capital call and its factual finding that the management fee was, in its entirety, fair, were both erroneous. These erroneous rulings led the trial court into further error when it rejected Castle's breach of fiduciary duty claim.

Moreover, MAF and Filter Depot are engaged in the same business. MAF, through its majority share in Filter Depot, unilaterally imposed the management fee upon Filter Depot which is comprised essentially of allocated costs of MAF employees, and MAF owned-and-rented building space and resources. MAF's sales in 2016 were around $6 million over six branches while Filter Depot's dropped from $1.3 million to under $800,000 in 2015. MAF was the accountant for Filter Depot and did not maintain any separate bank account for Filter Depot but instead commingled all of the books and monies. It is not difficult to conclude that MAF had the incentive and ability to cause Filter Depot to disappear completely into MAF. More importantly, given the financial picture presented of Filter Depot, the trial court erred by concluding that the invalid capital call and consent resolutions for the management fee were discharged by MAF "in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner the manager reasonably believes to be in the best interests of the limited liability company." MCL 450.4404(1). We therefore remand to the trial court for entry of a judgment in favor of plaintiffs and against MAF for the breach of fiduciary duty claim, and a determination of appropriate damages.

AIDING AND ABETTING

Finally, plaintiffs assert that the trial court erred in finding that the Shohams are not liable for aiding and abetting in the wrongful conduct of MAF. We agree.

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he:
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person. [Restatement (Second) of Torts § 876 (1979)]

Thus, in order for the Shohams to be liable for aiding and abetting, MAF must have engaged in tortious conduct. The trial court found that because plaintiffs failed to establish that MAF was liable for any tortious conduct, the Shohams could not be liable for aiding and abetting. We, however, have found that MAF engaged in member oppression and breached its fiduciary duties.

The Shohams are 100% owners of MAF. That being true, they were the voters on behalf of MAF for Filter Depot actions. They thus acted in concert with MAF in its membership oppression and breach of fiduciary duties and are liable for aiding and abetting in the same. We therefore remand to the trial court for entry of a judgment in favor of plaintiffs and against the Shohams on this claim and for a determination of appropriate damages.

CROSS-APPEAL

On cross-appeal, defendants contend that the trial court erred in its finding that the capital call violated the OA and thus finding no cause of action on Filter Depot's claim that Castle violated the OA by failing to contribute to the capital call. We disagree.

Section 3.2 of the OA provides:

Additional Contributions. In addition to the initial capital contributions, the Managers may determine from time to time that additional capital contributions are needed to enable the Company to conduct its business and affairs. After making such a determination, notice of it shall be given to all members in writing at least ten (10) business days before the date on which the additional contributions are due. The notice shall describe in reasonable detail, the purpose s and uses of such additional capital, the amounts of additional capital required, and the date by which payment of the additional capital is due . . . .

The capital call issued by consent resolution on May 9, 2014, stated that Filter Depot "determined that additional Member capital contributions are necessary in order to operate the business," that MAF "has made additional capital contributions to the Company in the amount of $233,436.59 since January 1, 2009," —while Castle and Dave made none— and that "the Company requires Members Ed Castle and David Castle to make additional contributions to the Company in the amount of $167,067.36 and $57,214.85, respectively, within ten (10) business days from the date of this resolution . . . ." The capital call thus did not "describe in reasonable detail, the purposes and uses of such additional capital," or "the amounts of additional capital required" as required by ¶ 3.2. Moreover, an email to Castle's counsel concerning the capital call indicated that the figure was arrived at simply by asking for the amount of the 50% profit distributions that the Castles had taken during those years and MAF had "left on the books." It was later admitted at trial that MAF did not make additional capital contributions to Filter Depot. The capital call thus contained an untrue and insufficient statement which failed to reasonably

-15-

detail the need for the call or the purposes for which the money would be used. The trial court properly found the capital call violative of the OA and Castle's failure to comply with it thus not a breach of the OA.

Defendants also claim, on cross-appeal, that the trial court erred in finding no cause of action on Filter Depot's claim of breach of fiduciary duties on the part of Castle. We disagree.

As previously stated, a manager such as Castle owes a fiduciary duty to the LLC set forth in MCL 450.4404(1) to "discharge the duties of manager in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner the manager reasonably believes to be in the best interests of the limited liability company." Filter Depot asserts that Castle breached its fiduciary duties to it by failing to tell it that his son Dave Castle was leaving Filter Depot's employ and going to work for a competitor and failing to otherwise prevent Filter Depot from suffering damages due to Dave's departure.

Dave Castle testified that he told Castle on or about Friday, March 12, 2014, that he was probably leaving Filter Depot, but was still unsure and would not be sure until after the weekend. According to both Dave Castle and Castle, Dave emailed his resignation to Filter Depot the following Sunday, and then told Castle he was leaving for sure. There is no evidence to the contrary. Thus, there is no indication that Castle had anything to tell Filter Depot regarding Dave's departure and the evidence indicates that Filter Depot had definitive knowledge of Dave's departure before Castle did.

As to what Castle could have done to prevent Filter Depot from suffering alleged damages due to Dave's departure, Filter Depot did not establish that it suffered damages exclusively due to Dave leaving or that Castle could have done anything about it. Filter Depot's gross profits and gross sales remained consistent until 2015. Dave did not have a non-compete agreement and arguably could have contacted any of Filter Depot's clients after his departure. And, Filter Depot's clients could also have left Filter Depot at any time. More importantly, Filter Depot has not shown that any loss of sales was due to customers that followed Dave to his new employment or that Castle could have prevented any customer from leaving. The trial court correctly ruled that Filter Depot failed to show that Castle breached fiduciary duties owed to it.

Affirmed as to all issues except the trial court's ruling with respect to member oppression, breach of fiduciary duties by MAF, and aiding and abetting by the Shohams. On those issues, we remand to the trial court for entry of judgment in favor of plaintiffs and a determination of appropriate damages. We do not retain jurisdiction.

/s/ Deborah A. Servitto
/s/ Elizabeth L. Gleicher
/s/ Cynthia Diane Stephens